IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JANN BANKS,

        Plaintiff,

v.                                    Civil Action No. 5:05cv62
                                         (Stamp)

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act

("Act"), 42 U.S.C. §§ 1381-1383f. The matter is awaiting decision on Plaintiff's Motion for

Judgment on the Pleadings and Defendant's Motion for Summary Judgment, and has been referred

to the undersigned United States Magistrate Judge for submission of proposed findings of fact and

recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Jann Banks ("Plaintiff") filed her application for SSI on March 24, 2003 (protective filing

date), alleging disability beginning January 21, 2002, due to coronary artery disease, diabetes, high

blood pressure, arthritis, acid reflux, and depression (R. 55, 62, 64, 95). The application was denied

initially and on reconsideration (R. 24, 25). Plaintiff requested a hearing, which Administrative Law

Judge ("ALJ") Jay Robert Brown held on September 2, 2004 (R. 292). Plaintiff, represented by

counsel, testified on her own behalf, along with Vocational Expert Joe Rose ("VE"). By decision

dated September 23, 2004, the ALJ denied benefits (R. 20). The Appeals Council denied Plaintiff's

request for review on December 14, 2004 , rendering the ALJ's decision the final decision of the Commissioner (R. 4).

## II. Statement of Facts

Plaintiff was born on June 25, 1958, and was 46 years old at the time of the ALJ's decision (R. 20, 38). She completed the eighth grade and worked in the past as a cook and a cashier (R. 296).

On February 11, 2000, Plaintiff presented to Barbara Broerman, M.D., with complaints of a cold for the last two weeks (R. 146). She was diagnosed as a smoker with an upper respiratory infection.

Two weeks later, Plaintiff's respiratory infection had resolved, but Dr. Broerman noted Plaintiff had hypertension, not adequately controlled (R. 145).

On April 13, 2000, Plaintiff was diagnosed with borderline hypertension (R. 144). She did not like taking her medication, and had stopped, because it caused her to be tired and slightly short of breath. Dr. Broerman advised her that if she really cut out salt and tried to lose a little bit of weight, she may be able to avoid additional medication.

On September 7, 2000, Plaintiff presented to Angela Harden-Mack, M.D., at the same office for her "history of hypertension and arthritis and rheumatic fever." Plaintiff stated that all was going well. She had no reports of chest pain, shortness of breath, or leg swelling (R. 143). The doctor found Plaintiff's hypertension was well-controlled with medication, and her arthritis was "currently asymptomatic." The doctor heard a systolic murmur in the aortic area.

On January 4, 2001, Plaintiff presented to Dr. Harden-Mack with complaints of bilateral hand numbness and tingling (R. 141). She stated she had had tingling and numbness in both arms and hands for three years, which had increased in the past couple of months. On examination, Plaintiff

had full range of motion of the shoulders, elbows and wrists, and had no tenderness to palpation or muscle atrophy of the hands or arms. The doctor diagnosed bilateral numbness and tingling of the fingers and hypertension.

Two weeks later, Plaintiff was diagnosed with diabetes (R. 140).

On June 12, 2001, Plaintiff presented to Dr. Harden-Mack, stating that all was well (R. 138). Her diabetes was asymptomatic on medications. She was still diagnosed with hypertension, albeit with some improvement. She also had a heart murmur, "consistent with aortic stenosis."

On July 18, 2001, Plaintiff reported she had stopped her ace inhibitor because it caused nausea and dizziness (R. 137). She was diagnosed with diabetes, slightly elevated, and hypertension "[c]ontrol could be better."

On January 2, 2002, Plaintiff presented to her doctor's office with complaints of nasal congestion, sneezing, and headache (R. 136). She had chest pain and tightness with coughing, and some nausea, diarrhea, and upset stomach. It was noted her weight was 208 pounds, and she was 5'3" tall. She was diagnosed with an upper respiratory infection versus allergies, and heart disease.

One week later, Plaintiff complained of dull aching in both upper arms with no numbness or tingling, but decreased strength (R. 133). She had no chest pain or shortness of breath. She was diagnosed with diabetes with poorly controlled diet and smoking, a reduced ejection fraction, arthritis, hypertension, and history of rheumatic fever.

On January 20, 2002, Plaintiff presented to the emergency room with chest pains and shortness of breath (R. 152). Although the doctor at the hospital wanted her admitted for observation, Plaintiff wished to go home, and was allowed to do so.

On January 23, 2002, Plaintiff presented to the ER with complaints of left arm and chest

3

burning (R. 161). Plaintiff was admitted with the probable diagnosis of new onset angina. During her hospital stay she had a "very small myocardial infarction." She had no further chest pain. She was transferred to another hospital for cardiac catheterization on January 24, 2002.

An echocardiogram performed that same day showed preserved systolic function with no definite regional wall motion abnormalities; moderate to moderately severe mitral regurgitation; and perhaps mild aortic stenosis.

A cardiac catheterization performed on January 24, 2002, indicated moderate mitral regurgitation; left main free of disease; LAD had minor nonobstructive disease; left circumflex had 80-90% stenosis of the first marginal branch with visible thrombus; and RCA nondominant and free of significant lesions, with 25-50% stenosis in the mid portion (R. 183).

Plaintiff underwent coronary angiography with stent placement to the circumflex marginal and balloon angioplasty just beyond the stent (R. 183). The surgeon opined that Plaintiff was left with a 10% residual stenosis of the circumflex marginal branch. He noted he had considered referring Plaintiff for surgical bypass and mitral valve repair at the same time as her stent placement, but then decided she should continue to be followed clinically for mitral regurgitation. He did opine that "certainly" mitral valve repair would need to be considered at some point. Plaintiff's cardiac surgeon, Randolph Renzi, M.D. diagnosed Plaintiff with single vessel coronary disease; mild left ventricular dysfunction with moderate to moderately severe mitral regurgitation and left atrial enlargement; and successful angioplasty and stent placement to the first obtuse marginal branch of the left circumflex coronary artery.

Plaintiff did well post-operatively. She was stable and ready for discharge on January 26, 2002, despite some brief chest discomfort and elevated total CK and MB fraction. Her final

diagnoses were non-Q wave myocardial infarction; single vessel coronary disease with successful intervention as described; rheumatic heart disease manifested by both aortic and mitral valve involvement – neither valve critical; diabetes; obesity; and hypertension

Plaintiff first applied for benefits on February 5, 2002, alleging an onset date of January 21, 2002 (R. 52). That application was denied at the initial and reconsideration levels and was never appealed.

On February 6, 2002, Plaintiff's doctor, Courtney Struthers, M.D. noted Plaintiff's recent hospitalization for coronary artery disease and stent placement (R. 131). Plaintiff reported feeling relatively well. She had had a very small myocardial infarction on January 23, and angioplasty. She was diagnosed with hypertension, smoking history, coronary artery disease with stent placement, and reduced systolic ejection fraction.

In early 2002, Plaintiff presented to Dr. Struthers, after going to the ER with what was later diagnosed as a probable panic attack (R. 130). She had recently suffered two deaths in the family, her mother and a handicapped grandchild. Her weight was 203 pounds at 5'3" tall, and her cholesterol was "very high." Her heart sounded slightly tachycardic.

On February 25, 2002, Plaintiff followed up with Dr. Renzi (R. 206). He noted she had been in the hospital the week before with atypical chest pain. A stress cardiolite showed a small inferior defect. Echocardiogram showed normal left ventricular size and function with moderate mitral regurgitation. Dr. Renzi noted that Plaintiff continued to do "fairly well." She had almost stopped smoking. Dr. Renzi still felt that Plaintiff would eventually need bypass surgery and mitral valve replacement, but wanted to treat her as long as possible before setting up that surgery.

In June 2002, Plaintiff reported being out of her medications (R. 127). Her blood pressure

5

was borderline high. She was given samples of medications.

On July 2, 2002, Plaintiff followed up with Dr. Renzi (R. 207). Plaintiff reported doing better in general, without exertional dyspnea or other complaints. She said she had had to stop Zocor due to gastrointestinal problems. Dr. Renzi diagnosed Cardiomyopathy secondary to mitral regurgitation, still noting she would eventually need mitral valve repair; coronary artery disease with symptoms stable; and dyslipidemia and diabetes.

On July 3, 2002, State agency reviewer Robert Marinelli completed a Psychiatric Review Technique ("PRT"), finding only that there was insufficient evidence to assess Plaintiff for a psychiatric impairment (R. 208).

Also on July 3, 2002, State agency reviewing physician Thomas Lauderman, D.O. completed a physical residual functional capacity assessment ("RFC"), finding insufficient evidence for a determination regarding Plaintiff's RFC (R. 229).

On July 23, 2002, Plaintiff underwent an echocardiogram which indicated normal left ventricular size and systolic function with ejection fraction of 55-60% with no regional wall motion abnormalities; mild concentric LVH; at least moderate mitral regurgitation, but perhaps more severe; and no significant change since January 2002 (R. 234).

In October 2002, Plaintiff presented to Dr. Struthers with complaints of three to four days of productive cough, feeling tired, and aching joints (R. 126). She was diagnosed with probable viral upper respiratory infection.

On February 13, 2003, Plaintiff presented to Dr. Struthers following a hospital visit for chest pain and heaviness (R. 125). Cardiac workup was negative and a GI cocktail resolved her symptoms. Plaintiff had been released from the hospital with a diagnosis of esophagitis and chest pain. She was unable to afford Prevacid.

On February 19, 2003, Plaintiff underwent a stress test for chest pain (R. 232). The test had to be stopped due to fatigue. It did show borderline ischemia, but was symptomatically negative at the point it was stopped.

An echocardiogram performed that same date showed normal left ventricular chamber size and mild concentric left ventricular hypertrophy; normal left ventricular systolic function; moderate mitral regurgitation; mildly thickened mitral valve leaflets with mildly reduced opening but normal inflow pattern; and no significant change compared to the July 2002 study (R. 230-231).

On April 1, 2003, Plaintiff followed up with Dr. Struthers for her coronary artery disease, hypertension, and rheumatic heart disease with mitral regurgitation (R. 122). Plaintiff reported doing much better on increased medication. She reported feeling very stressed and not sleeping well, however. Dr. Struthers prescribed a sleep medication and referred Plaintiff to a psychologist.

On April 4, 2003, Plaintiff presented to Shenandoah Valley Behavioral Health Services for an Initial Evaluation performed by L. McDonnell, PhD (R. 235). Plaintiff reported she was living alone, and she and her husband had separated after 25 years, but would not file for divorce (R. 235). She had told him to leave six or seven months earlier because he was "drinking and carrying on." She did not report a "presenting problem," instead stating that Dr. Struthers had told her to come due to a problem dealing with her granddaughter's death and her mother's death a year earlier. She said she just did not feel so good most of the time.

Plaintiff reported doing child care (R. 238). Children and her role as a grandmother gave her a lot of joy. She played Bingo and liked to sew. She was "always making something for [her] sister." Her goals were to be a good mom and to learn how to help herself get over depression.

Upon mental status examination, Plaintiff was alert, oriented, neat, clean, well-groomed, and

cooperative (R. 240). She made good eye contact. Her affect was anxious and panicky and depressed, and she reported panic attacks. Her reported mood was sad most of the time and irritable sometimes. Her thought processes were logical. Dr. McDonell opined Plaintiff's concentration, judgment, insight, and general fund of information were all "fair."

Plaintiff reported symptoms of hopelessness, helplessness, worthlessness, appetite disturbance, sleep disturbance, increased nightmares, mood swings, guilt, anhedonia, lethargy, decreased libido, racing thoughts, frequent hand washing, rearranging, grandiosity, shortness of breath, palpitations, chest pain, and hyperventilation. She reported having suicidal ideas with no intent or plan sometimes. She had gone two times to the ER due to symptoms she believed were heart-related, but were considered to be probable panic attacks.

Dr. McDonnell diagnosed panic/anxiety attacks and major depression-recurrent. She opined Plaintiff's Global Assessment of Functioning ("GAF") as 70-80[1] with a high in the past year of 85.

On April 17, 2003, Plaintiff filed her application for SSI, alleging disability since January 21, 2002 (R. 55).

On April 29, 2003, State agency reviewing physician Cynthia Osborne, D.O., completed an RFC of Plaintiff, opining Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hours workday (R.

---

[1]A GAF of 61 to 70 indicates **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.**

A GAF of 80-90 indicates **Absent or minimal symptoms** (e.g., mild anxiety before an exam), **good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns** (e.g., an occasional argument with family members). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

245). She could frequently balance, kneel, crouch, and crawl, but only occasionally climb and stoop. She should avoid concentrated exposure to extreme cold and hazards (R. 248). Dr. Osborne noted Plaintiff was diagnosed with obesity, weighing 208 pounds at 5'3" tall (R. 250-251).

State agency reviewing physician L. Dale Simmons reviewed the evidence and affirmed Dr. Osborne's RFC on April 29, 2003 (R. 251).

On May 23, 2003, State agency reviewer Robert Marinelli completed a PRT, finding Plaintiff had an affective disorder, but it was not severe (R. 252). He found she had only a mild degree of limitation of activities of daily living, social functioning, and concentration, persistence, or pace, and had had no episodes of decompensation (R. 262).

On May 3, 2003, State agency reviewing psychologist Frank Roman affirmed Dr. Marinelli's PRT (R. 252).

On October 29, 2003, State agency reviewing physician L. Dale Simmons completed an RFC of Plaintiff, opining she could lift 20 pounds occasionally; 10 pounds frequently; stand/walk 6 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday (R. 267). She could only occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl, and could never climb ladders, ropes or scaffolds. She should avoid concentrated exposure to extreme cold and hazards (R. 270).

On January 7, 2004, Plaintiff was admitted to the hospital with increasing chest pressure, heaviness, and tightness over the past week (R. 281). Dr. Renzi recommended repeat echocardiogram and cardiac catheterization. Plaintiff's pain continued to worsen. She was treated in the ER and then admitted.

Plaintiff underwent a repeat catheterization on January 7, 2004 (R. 284). It showed the left circumflex artery stent was widely patent with no high grade obstructive disease. The right coronary

artery had irregularities, but was grossly free of obstructive disease. The left anterior descending ("LAD"), however, had a greater than 95% stenosis in the mid segment.[2] Plaintiff was diagnosed with single-vessel coronary disease with severe mitral regurgitation and was referred for coronary bypass surgery as well as mitral valve repair surgery.

Plaintiff underwent mitral valve repair combined with coronary bypass surgery on January 9, 2004 (R. 278). There were no complications to the surgery. Plaintiff was discharged from the hospital on January 16, 2004, seven days later, with a final diagnosis of mitral valve regurgitation; atherosclerotic coronary artery disease; non-insulin-dependent diabetes; tobacco abuse; and dyslipidemia (R. 278). She was instructed not to drive, lift more than five pounds or do anything strenuous for the next six weeks.

Plaintiff followed up with Dr. Renzi on May 11, 2004 (R. 290). Dr. Renzi found that Plaintiff was doing well from a cardiac standpoint. She still had some atypical chest pain which he believed sounded more musculoskeletal. She had not really had any anginal complaints, and walked without shortness of breath, although she was still relatively sedentary.

A followup echocardiogram on May 24, 2004, was fairly normal with the exception of mild residual mitral regurgitation (R. 289). There was no evidence of significant stenosis.

On September 1, 2004, Plaintiff's treating cardiologist, Dr. Renzi, completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" (R. 274). He opined that Plaintiff could occasionally lift 10 pounds, frequently left less than 10 pounds, stand/walk less than 2 hours in an 8-hour workday; and sit less than 6 hours in an 8-hour workday. He based this opinion

---

[2]The record indicates that Plaintiff's LAD had only "minor nonobstructive disease" one year earlier, and her mitral regurgitation was considered only moderate to moderately severe at that time.

on Plaintiff's coronary artery disease, mitral valve repair, hypertension, and tobacco abuse. He opined Plaintiff could occasionally climb, balance, kneel, crouch, crawl, and stoop. He also opined Plaintiff could reach, handle, finger and feel, and her seeing hearing, and speaking were unrestricted. She should avoid temperature extremes, dust, hazards, and fumes

At the administrative hearing, held on September 2, 2004, Plaintiff testified she weighed 199 pounds (R. 298). She believed she had weighed up to 220 when she last worked. She had no income and relied on her son and a sister to help pay her bills.

Plaintiff testified that the biggest obstacle to her working was chest pain (R. 301). If she exerted herself too much she needed to use a nitroglycerin tablet. She also had aching hands, for which she took two 800 milligram Ibuprofen just to dull the pain. She could not hold onto much of anything. She no longer sewed much because of her hand problems, and played Bingo only "every now and then."

The ALJ asked the VE what light jobs were available if Plaintiff were able to lift 10 pounds frequently and 20 pounds occasionally (R. 311). The VE testified the jobs of non-precision assembler and hand packer would be available in significant numbers in the local and national economy. If Plaintiff were limited to sedentary work (limited to lifting 10 pounds), the VE testified there would still be jobs available, including sedentary non-precision assembler and teachers' aide (R. 312). Neither Plaintiff's limited education nor her "mild" difficulties due to her affective disorder would have any effect on the jobs at the "non-exertional" level according to the VE (R. 313). If the person had numbness of the hands which caused her to drop things, the assembler and hand packer jobs the VE named would be precluded.

## III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since the amended onset of disability.

2. The claimant's depression and coronary artery disease are considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding her limitations are partially credible for the reasons set forth in the body of the decision.

5. The claimant has the following residual functional capacity to perform light work [sic].  The claimant can lift and carry no more than ten pounds on a regular basis, sit about six hours in an eight-hour workday and stand and/or walk two hours in a[n] eight-hour workday, alternating positions.  She can balance, kneel, crouch and crawl. She is able to reach, handle, finger and feel; and she should avoid extreme temperature changes, vibrations, hazards and fumes.  She is able to remember, understand and carry out short simple instructions.

6. The claimant is unable to perform any of her past relevant work (20 CFR § 416.965).

7. The claimant is a "younger individual between the ages of 45 and 49" (20 CFR § 416.963).

8. The claimant has a " limited education" (20 CFR § 416.964).

9. The claimant has no transferable skills from any past relevant work (20 CFR § 416.968).

10. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

11. Although the claimant's limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.17 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs include work as an assembler, hand packer and

teacher aide.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision. (20 CFR § 416.920(g)).

(R. 19-20).

## IV. The Parties' Contentions

Plaintiff contends:

1.  The ALJ's hypothetical questions to the VE which became the ultimate basis for a denial of benefits do not remotely describe Banks' Residual Functional Capacity or even Banks' Residual Functional Capacity as recorded in the ALJ's Decision.

2.  The ALJ failed to consider the medical opinion of Dr. Renzi.

3.  The ALJ failed to consider the combined effect of all the impairments alleged.

Defendant contends:

1.  Substantial evidence supports the ALJ's decision at Step Five of the sequential process that Plaintiff could perform other work in the national economy.

2.  Substantial evidence supports the ALJ's evaluation of the medical evidence.

3.  The ALJ considered the combined effects of all of Plaintiff's alleged impairments.

## V. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)*(quoting* Consolidated Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. ALJ's RFC versus his Hypothetical to the VE

Plaintiff first argues that the ALJ's hypothetical questions to the VE which became the ultimate basis for a denial of benefits do not remotely describe Banks' Residual Functional Capacity or even Banks' Residual Functional Capacity as recorded in the ALJ's Decision. Defendant contends substantial evidence supports the ALJ's decision at Step five of the sequential process that Plaintiff could perform other work in the National economy.

The colloquy between the ALJ and the VE at the hearing was as follows:

Q: Mr. Rose, if in fact Ms. Banks' heart condition would allow her to lift 10 pounds frequently and 20 pounds occasionally, what light jobs would you suggest for such a person?

A: I would identify the first job as that of a non-precision assembler . . . . The second job at the light exertional level would be that of a hand packer . . . .

Q: And so if, in fact, Ms. Banks' physical condition would only permit her to lift 10 pounds, what sedentary type jobs would you suggest?

A: The first job would be that of a - - again, a non-precision assembler at the sedentary level . . . . And the second job would be that of a teachers' aide . . . .

14

Q:      Mr. Rose, would Ms. Banks' limited education through the ninth grade have an impact on her ability to do a teachers' aide job?

A:      No, Your Honor.

Q:      Okay. If, in fact, Ms. Banks had some emotional problems which are described as affective disorder which produce restrictions of activities of daily living to a mild degree and difficulties of maintaining social function mild and difficulties in maintaining concentration, persistence or pace mild, what impact would that have on your testimony?
        . . . .

A:      At the nonexertional levels, probably none.

(R. 311-313). The ALJ in his Decision found:

> [Plaintiff] retains the residual functional capacity to perform the exertional demands of light work, or work which requires maximum lifting of twenty pounds and frequent lifting of ten pounds; some light jobs are performed while standing, and those performed in the seated position often require the worker to operate hand or leg controls . . . . The evidence supports a finding that the claimant is not able to lift and carry more than ten pounds on a regular basis, sit about six hours in an eight-hour workday and stand and/or walk two hours in and eight-hour workday, alternating positions. She can balance, kneel, crouch and crawl. She is able to reach, handle, finger and feel; and she should avoid extreme temperature changes, vibration, hazards and fumes. She is able to remember, understand and carry out simple instructions.

(R. 17).

In his actual Findings, the ALJ stated:

> The claimant has the following residual functional capacity to perform light work. The claimant can lift and carry no more than ten pounds on a regular basis, sit about six hours in an eight-hour workday and stand and/or walk two hours in a [sic] eight-hour workday, <u>alternating positions</u>. She can balance, kneel, crouch and crawl. She is able to reach, handle, finger and feel; and <u>she should avoid extreme temperature changes, vibrations, hazards and fumes. She is able to remember, understand and carry out short simple instructions.</u>

(Emphasis added). Defendant concedes: "Plaintiff is correct in her claim that the ALJ's [RFC] finding is more restrictive than the limitations listed in his hypothetical question." (Defendant's brief

15

at 7). Defendant argues, however, that Plaintiff "ignores the fact that substantial evidence supports the ALJ's finding that there are a significant number of jobs that Plaintiff can perform, even with the ALJ's more restrictive RFC finding." (Id.). Defendant then argues:

> The ALJ, after hearing the VE's testimony, obviously gave Plaintiff the benefit of the doubt in making his RFC finding. In particular, the ALJ found that Plaintiff should alternate positions, was restricted to short, simple instructions, and should avoid temperature extremes, vibrations, hazards, and fumes . . . . There is nothing in the ALJ's RFC finding, however, that would preclude Plaintiff from performing the jobs identified by the VE, as examples of the assembler job and hand packer jobs found in the Dictionary of Occupational Titles . . . clearly fit within the ALJ's expanded RFC finding.

The undersigned disagrees with Defendant's argument. At the fifth step of the sequential evaluation, "the burden shifts to the [Commissioner] to produce evidence that other jobs exist in the national economy that the claimant can perform given his age, education, and work experience." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). The ALJ must consider the claimant's RFC, "age, education, and past work experience to see if [he] can do other work." 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

The ALJ may rely on VE testimony to help determine whether other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1566(e), 416.966(e). The Fourth Circuit has held that "[t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir.1993) (citing Walker v.

Bowen, 876 F.2d 1097, 1100 (4th Cir.1989)).

If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. Edwards v. Bowen, 672 F. Supp. 230, 235 (E.D.N.C. 1987). The reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir. 1993).

Here the ALJ clearly relied on the VE's testimony (R. 18). Yet the VE was not asked whether a need to alternate positions, a need to avoid temperature extremes, vibrations, hazards, and fumes or a restriction to short, simple instructions would affect his testimony. The undersigned therefore finds that the ALJ's hypothetical to the VE did not "accurately reflect[] all of the claimant's limitations." In particular, the undersigned notes that the DOT does not address the need for a sit-stand option. Additionally, although the ALJ included that Plaintiff had a ninth-grade education and mild restrictions due to her affective disorder, the undersigned cannot find that these limitations are necessarily the same as limitation on "remember[ing], understand[ing] and carry[ing] out [only] short simple instructions."[3]

Because the undersigned finds the ALJ's hypothetical to the VE cannot be said to accurately reflect all of Plaintiff's limitations, the undersigned therefore finds substantial evidence does not support the ALJ's determination that a significant number of jobs exist in the local and national economy that Plaintiff could perform.

_____

[3]The undersigned also notes that the evidence indicates Plaintiff had only an 8th grade, not a 9th grade education, but does not believe this would have affected the availability of jobs had they been restricted to those requiring only short simple instructions.

## C. Dr. Renzi's Opinion

Plaintiff next argues that substantial evidence does not support the ALJ decision because he failed to consider the medical opinion of Dr. Renzi. Defendant contends that substantial evidence supports the ALJ's evaluation of the Medical Evidence.

It is indisputable that Dr. Renzi is Plaintiff's treating physician for her cardiac impairments. Dr. Renzi completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" on September 1, 2004 (R. 274). The Fourth Circuit stated in Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984):

> We cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. *See, e.g., Myers v. Califano*, 611 F.2d 980, 983 (4th Cir. 1980); *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979); *Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977). As we said in *Arnold*: The courts . . . face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all the evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." 567 F.2d at 259. Neither the ALJ nor the Appeals Council indicated the weight given to the various medical reports submitted by the appellant. We therefore remand to the district court with instructions further to remand the case to the Secretary with directions to the Secretary to reconsider the case and to indicate explicitly the weight accorded to the various medical reports in the record.

In addition, Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). The Regulation goes on to state:

When the determination or decision:

> is not fully favorable, e.g., is a denial . . . .

> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Here the ALJ did not indicate the weight he accorded to Dr. Renzi's opinion.

In addition, 20 C.F.R. § 404.1527 states:

> (d) *How we weigh medical opinions* . Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion:

>> (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

>> (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give

your treating source's opinion.

> (I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

The Fourth Circuit has held: "Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983).

While the ALJ quoted from Dr. Renzi's opinion, he did not state what weight, if any, he gave this treating physician's opinion. His decision does not address the factors required by § 404.1527. Dr. Renzi opined Plaintiff could not lift more than 10 pounds, could stand/walk less than two hours in an eight-hour workday, and could sit less than six hours in an eight-hour workday.

These limitations would preclude Plaintiff from working at any full-time job. Defendant correctly asserts that a physician's opinion that a claimant cannot work or is disabled cannot be given controlling weight or even special consideration. See Social Security Ruling ("SSR") 96-2p. However, that Ruling also provides:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

The ALJ did concur with the conclusions of the State Agency medical consultants who determined that Plaintiff could work at the light exertional level (R. 17). The undersigned finds it significant, however, that the last of these opinions was rendered in October 2003, before Plaintiff's second cardiac surgery, while Dr. Renzi's opinion was rendered after the second surgery.

For all the above reasons, the undersigned finds the ALJ erred by failing to indicate the weight, if any, he accorded Dr. Renzi's opinion, and by failing to explain his reasons for his apparent rejection of that opinion.

### D. Combination of Impairments

Plaintiff lastly argues that the ALJ failed to consider the combined effect of all the impairments she alleged. Defendant contends the ALJ considered the combined effects of all of Plaintiff's alleged impairments.

The ALJ found Plaintiff had coronary artery disease and depression, and found these impairments were severe (R. 15). He did not, however, discuss Plaintiff's alleged hand problems or her obesity, among others.

In 2001, Plaintiff complained to her treating physician about hand numbness and tingling. At the administrative hearing Plaintiff testified she had aching hands, could not hold onto much of anything, and no longer sewed much because of her hand problems. Plaintiff's counsel asked the VE if the jobs he named would remain available if the hypothetical individual had arthritis involving the hands, that limited the individual to handling for about 15 minutes to a half hour at a time before the individual would drop articles. The VE testified this limitation would, in all likelihood, preclude the assembler and hand packer jobs he had identified. As noted, however, the ALJ did not discuss Plaintiff's alleged hand impairment.

More significantly, the ALJ did not consider Plaintiff's obesity anywhere in his Decision. SSR 02-1p provides, in pertinent part:

We will consider obesity in determining whether:

> The individual has a medically determinable impairment.

> The individual's impairment(s) is severe.

> The individual's impairment(s) meets or equals the requirements of a listed impairment in the listings.

> The individual's impairment(s) prevents him or her from doing past relevant work and other work that exists in significant numbers in the national economy.

The Ruling further provides that, in assessing RFC:

Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect

ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.

The effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day. Obesity may also affect an individual's social functioning.

An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. As explained in SSR 96-8p ("Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims"), our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea.

The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

Defendant argues, *inter alia*, that Plaintiff has not demonstrated that she has any functional limitations as a result of her obesity, "especially since she has lost weight since she last worked." Defendant cites Craig v. Chater, 76 F.3d 585 (4th Cir. 1996), for the proposition that a "claimant who worked in the past with impairment must show condition has deteriorated since she last worked." The undersigned finds it is indisputable, however, that Plaintiff's condition deteriorated since she last worked in 1999 (R. 60, 65). This was before she had a heart attack, before her two coronary surgeries and mitral valve repair, and before she reported symptoms of, and was diagnosed with diabetes.

This is not to say that Plaintiff's other alleged impairments are severe or cause any functional

limitations. The undersigned finds, however, that substantial evidence does not support the ALJ's omission of these alleged impairments from his consideration.

Defendant also argues that "Plaintiff reported that she babysits her sister's two children five days a week, six hours each day." ( Defendant's brief at 14), citing Plaintiff's reported "Activities of Daily Living" (R. 109). The ALJ also refers to Plaintiff's activities as reported on that form. The undersigned notes, however, that that form was dated April 24, 2003, again before Plaintiff's second heart surgeries.

For all the above reasons, the undersigned finds that substantial evidence does not support the ALJ's determination that Plaintiff was not disabled at any time through the date of his decision.

## VI. Recommendation

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's application for SSI. I accordingly recommend Defendant's Motion for Summary Judgment [R.19] be **DENIED**, and Plaintiff's Motion for Summary Judgment or, in the Alternative, Motion to Remand [R. 18] be **GRANTED in part**, by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy

of such objections should also be submitted to the Honorable Frederick P. Stamp, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

DATED: *December 7, 2006*

*John S. Kaull*

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE